IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PATRICIA HALL and WALTER MCCOMBS,   )
           Plaintiffs,     )
                   )
       vs                   )      Civil Action No. 11-213
                   )      Magistrate Judge Mitchell
GUARDSMARK, LLC,          )
           Defendant.     )

## MEMORANDUM AND ORDER

Plaintiffs, Patricia Hall and Walter McCombs, bring this action alleging that Defendant, Guardsmark, LLC, violated the Fair Labor Standards Act, 29 U.S.C. §§ 201-19 (FLSA), by requiring them to work as security guards for more than 40 hours per week without compensating them for such additional time. They allege that they were required to record only their official shift times, rather than time actually worked; that they were required to be at their post prior to the start of their shift without being compensated for such time; that they were similarly required to remain at their post after their shift ended without being compensated for such time; and that they were required to wear a uniform that they had to clean at home, without being compensated for the time spent on this task.

Presently before the Court for resolution is Defendant's motion for summary judgment. For the reasons that follow, the motion will be granted in part and denied in part.

Facts[1]

Hall worked as a full-time security guard on various shifts for Guardsmark from August

---

[1] The facts are taken from the Concise Statement of Material Facts filed by Defendant (ECF No. 101) and from Plaintiffs' Statement of Genuine Issues (ECF No. 105). Plaintiffs have not always responded to Defendant's Concise Statement with citations to the record to support their denials, as required by Local Rule 56(C)(1). Defendant argues that, pursuant to the Local Rules, some of its facts should thus be deemed admitted. LCvR 56(E). This issue is discussed further below.

5, 2008 to July 7, 2009. (Hall Dep. at 36; Hall Decl. ¶ 2.)[2] She quit her employment with Guardsmark on July 7, 2009. She only worked for Guardsmark for approximately eleven months. (Hall Dep. at 36; Hall Dep. Civ. A. No. 11-115 at 161.[3]) McCombs was her immediate supervisor during her entire employment at Guardsmark. (Hall Dep. at 24, 36.)

McCombs began working as a security guard on various shifts for Guardsmark on October 22, 2007. He was promoted to a site supervisor on July 29, 2008. (McCombs Dep. at 60, 108.)[4] Although McCombs worked thereafter as a supervisor at Guardsmark until July 2009, he only seeks recovery for the time he spent as a security guard until August 2008, or approximately nine months. (McCombs Decl. ¶ 2.)[5] McCombs was terminated from his position as a site supervisor on July 20, 2009 because of unauthorized computer and internet use. (McCombs Dep. at 21, 27.)

Guardsmark disseminated common orders, regulations and instructions to all security officers in two manuals entitled "Guardsmark Means This to You" ("GMTTY")[6] and "General Orders Regulations and Instructions for Uniformed Personnel" ("GOR&I").[7] GMTTY contains the following provisions:

> Your earnings are calculated from the information you are responsible for providing on the Weekly Time Record form. Each week you perform work, you continue to submit to your supervisor a Weekly Time Record form….
>
> Always put all hours worked on your time record. Guardsmark's policy is to pay for all hours worked every pay period. Even though your time worked is recorded on the Daily Report forms and Learning and Development records, your Weekly Time Record will be relied upon to calculate pay due to you….

---

[2] Def.'s Appx. (ECF No. 102) Exs. A, H.
[3] ECF No. 102 Ex. B.
[4] ECF No. 102 Ex. C.
[5] ECF No. 102 Ex. G.
[6] Hall Dep. Ex. 1.
[7] Hall Dep. Ex. 2.

All questions on how to complete the Weekly Time Record form should be directed to your immediate supervisor….

If you believe the hours upon which your pay was calculated are not correct, follow the complaint procedure contained in the "General" section of this handbook. It is important that you notify Guardsmark management promptly so that any problem with your pay can be resolved quickly and in a fair manner….

The nature of your duties may require that you be available for work outside of a regularly scheduled work week. Emergencies, accidents, severe weather and strikes are situations that create the need for you to remain flexible in your work schedule.

You will, of course, be paid each pay period for all hours worked during that pay period. Note also that if you are required to report early for work duties in order to allow for transition or overlay between shifts you will be paid for that additional working time. If reporting early is required, you will receive written instructions to that effect.

(Hall Dep. Ex. 1 at 12, 13, 15, 40.)

GOR&I includes the following policy:

Company policy requires that all security officers be on post ready to start their tours of duty at the assigned commencement time of their duty shifts. Unless specifically directed in writing by the Manager in Charge, do not report before your shift starts or stay after it ends, if properly relieved.

(Hall Dep. Ex. 2 at 22.) When they began working for Guardsmark, both Hall and McCombs

received a copy of these policies. (Hall Dep. at 18, 37-38; McCombs Dep. at 66-67.)

Both Hall and McCombs signed an Employment Agreement, in which they agreed as

follows:

Employee agrees to abide by the General Orders, Regulations and Instructions for Uniform Personnel …which has been issued to him (her) and any amendment thereto issued during the course of Employee's employment….

It is Guardsmark's policy to compensate its employees for all time worked. Employee must record daily on his (her) Weekly Time Record the exact times he (she) starts and completes work and sign it weekly. Guardsmark will rely on those records to pay Employee. Employee understands that, regardless of how well-intentioned, reporting to the premises or facilities of a client prior to scheduled starting time or remaining after scheduled quitting time is expressly

3

forbidden by Guardsmark.  It is specifically understood and agreed that, except under the circumstances set forth by the GOR&I Employee agrees to work only the hours he (she) is scheduled to work.

(Hall Dep. Ex. 3 ¶¶ 2, 6; ECF No. 102 Ex. I ¶¶ 2, 6.)

Hall stated that, based upon the agreement she signed, she had to abide by GOR&I; that it was Guardsmark's policy to compensate employees for all time worked; that she had to record daily on her Weekly Time Record (WTR) the exact times she started or completed work and sign this form weekly; that Guardsmark would rely on this record to pay her; and that regardless of how well-intentioned, reporting to the premises or facilities of a client prior to scheduled starting time or remaining after scheduled quitting time was expressly forbidden by Guardsmark.  (Hall Dep. at 38-39.)  She also stated that the agreement indicated that it could not be changed by anybody.  (Hall Dep. at 97.)

In signed declarations,[8] Plaintiffs state that Guardsmark maintained a common written policy that required all security officers to track their hours worked by entering their approved shift start and end times on a Daily Activity Report form; that Guardsmark maintained a common written policy that required all security officers to track their hours worked by entering "only the number of hours they were authorized to work" in a "true hours worked" box on the Daily Activity Report; that barring an express authorization of overtime work, all Guardsmark security officers regularly complied with these policies by preparing Daily Activity Reports that showed eight hours worked per shift; that Guardsmark maintained a common written policy that

[8] Hall and McCombs submitted these declarations, which are both dated May 11, 2012, in connection with their motion for an order authorizing notice to similarly situated persons (ECF No. 49 Exs. A, B).  As the Court observed in the August 17, 2012 Memorandum and Order denying the motion, the declarations postdate their depositions (Hall was deposed on November 9, 2011, and McCombs on November 7, 2011).  (ECF No. 72 at 20-21.)  Thus, to the extent that the later-filed declarations contain statements that contradict earlier sworn deposition testimony without explanation, such statements will be disregarded under the "sham affidavit" doctrine.

required all security officers to complete a WTR form showing the total number of hours each security officer was authorized to work each week; that Guardsmark supervisors regularly complied with this policy by preparing WTRs that showed they worked eight hours per shift; and that Guardsmark maintained a common practice of paying all security officers on the basis of their assigned shifts (i.e., eight hours per shift) rather than on their actual work start and end times. (Hall Decl. ¶¶ 5-10; McCombs Decl. ¶¶ 5-10.)

Plaintiffs state that they worked under a common written policy that required all security officers to arrive early for work so that shift transitions would run smoothly and on time, posts would not experience a lapse in security during shift changes and Guardsmark could minimize overtime hours and wages charged to its clients; that they regularly arrived at work at least 15 minutes before their scheduled shift start time to perform pre-shift work that included receiving pass down instructions, checking equipment, meeting with supervisors, guarding, monitoring, patrolling, inspecting and surveilling; that Guardsmark knew they regularly arrived early because their supervisors regularly suffered and permitted them to perform this work, their supervisors saw them performing this work and regularly reviewed their time and pay records; and that Guardsmark did not effectively prevent them from performing "off-the-clock" pre-shift work it did not want performed, accurately track the amount of "off-the-clock" pre-shift work they actually performed or pay all wages they were owed for such work. (Hall Decl. ¶¶ 11-15; McCombs Decl. ¶¶ 11-15.)[9]

Similarly, Plaintiffs state that Guardsmark maintained a common written policy or

---

[9] The declarations also state that Plaintiffs had to arrive early to review post orders and collect schedules, but they testified at their depositions that they did not know what post orders were and that their duties did not include collecting schedules. (Hall Dep. at 98; McCombs Dep. at 103-04.) Therefore, the statements about these duties will be disregarded. See Smith v. Johnson & Johnson, 593 F.3d 280, 285 n.3 (3d Cir. 2010).

practice that prohibited all security officers from leaving their post before their approved shift end time so that all security officers would remain on duty throughout their entire shift, be available to provide pass down instructions to their relief workers and so posts would not experience a lapse in security during shift changes; that they regularly worked about 15 minutes past their scheduled shift end time to perform post-shift work that included providing pass down instructions, putting away equipment, reviewing and completing their daily logs and event report and confirming their next work assignment; that Guardsmark knew they regularly stayed at their posts after their authorized shift end-time because their supervisors regularly suffered and permitted them to perform this work, their supervisors saw them performing this work and regularly reviewed their time and pay records; and that Guardsmark did not effectively prevent them from performing "off-the-clock" post-shift work it did not want performed, accurately track the amount of "off-the-clock" pre-shift work they actually performed or pay all wages they were owed for such work.  (Hall Decl. ¶¶ 17-21; McCombs Decl. ¶¶ 17-21.)

Finally, Plaintiffs state that Guardsmark maintained a common written policy that required all security officers to report to work wearing certain standard uniform items; that Guardsmark maintained a common written policy that made all security officers responsible for the care and maintenance of their uniform and equipment items; that Guardsmark maintained a common written policy that required all security officers to keep their uniform neat, clean and well pressed at all times; that Guardsmark maintained a common policy or practice prohibiting its security offices from maintaining their uniform components "on the clock" or at their work sites; that they regularly preformed between one and two (Hall) or between one and three (McCombs) hours of "off-the-clock" uniform maintenance each week without compensation including washing, spot cleaning, drying and ironing their work uniforms and shoes; that

Guardsmark knew that its security offices regularly performed "off-the-clock" uniform maintenance work because such work could not be completed during assigned work hours or at assigned work locations, their supervisors regularly suffered and permitted them to perform this work, their supervisors saw the results of this work and regularly reviewed their time and pay records; and that Guardsmark did not effectively prevent them from performing "off-the-clock" uniform maintenance work it did not want performed, require its security officers to maintain a contemporaneous record of their uniform maintenance work or pay all wages they were owed for such work. (Hall Decl. ¶¶ 23-31; McCombs Decl. ¶¶ 23-31.)

Hall testified that, contrary to the written instructions cited by Guardsmark, what actually occurred was that she did not complete a WTR. Instead, she completed a Daily Activity Report (DAR), on which she put the times of her shifts as her hours worked.[10] She also would sign a WTR, but it was blank. (Hall Dep. at 40-41, 53-54; ECF No. 106 Ex. J.) Guardsmark explains that a DAR is a report that outlines what duties, occurrences and situations arose while a security guard was on shift. It asserts that the "True Hours worked" section at the bottom of the report meant the hours the employee was working, but the testimony cited actually states that "True Hours worked" meant the length of the shift. (Turner Dep. at 59-60.)[11] See also GOR&I at 85 (True Hours worked "should include only the number of hours that you have been authorized to work.")[12]; Turner Dep. at 28-36, 68-69, 73-74, 167 (absent an emergency or unexpected event, True Hours worked mean the scheduled shift time); Martin Dep. at 50-52, 56-58, 85, 133 (guards were paid for time recorded, but if they put time beyond their scheduled shifts, they would be

---

[10] Defendant states that Hall claims she was paid based on her DAR. (ECF No. 101 ¶ 34)(citing Hall Dep. at 53-54.) Plaintiffs' response is "Denied. See ¶ 18, above." (ECF No. 105 ¶ 34.) Paragraph 18, however, says "Admitted." (ECF No. 105 ¶ 18.)
[11] ECF No. 106 Ex. B.
[12] ECF No. 106 Ex. A.

counseled and disciplined)[13]; Bohnke Dep. at 26-33, 51-54, 80-81, 88-89, 94, 120-21 (Hall and McCombs were trained to enter their authorized shift start and stop times as "True Hours" worked).[14] They also note that each employment agreements stated that: "Employee agrees and understands that failure to properly complete Daily Reports that will agree with the employee's Weekly Time Record may be cause for Guardsmark to withhold reimbursement to the Employee for that period." (ECF No. 106 Ex. M ¶ 14.)

Hall was told to complete the DAR as accurately as possible and to put in as much detail as she could. (Hall Dep. at 54-55.) If she put 3:45 on a DAR, that would mean she arrived at work at that time and if she put 4:00 it would mean she arrived at 4:00. Anything a security officer normally did would be reflected on the DAR. (Hall Dep. 42, 57-59.) As Hall's supervisor, McCombs always initialed the tops of the DARs. (Hall Dep. at 73.) Part of McCombs's job was to review the security officers' reports, including the DARs. (McCombs Dep. at 45-46.) In the report McCombs submitted approving the DARs, the report indicated that the DARs had to be submitted to the branch office within two weeks of completion. (ECF No. 102 Ex. O.) Thus, Guardsmark observes, they could not have been used as payroll records.

If Hall felt like she wanted to go work a shift and she was not on the schedule, she would not be permitted to voluntarily work a shift. (Hall Dep. at 169.) During a regular shift the security officers would complete the DAR within eight hours. (McCombs Dep. at 179-80.) Hall testified that the DARs would be an accurate reflection of her hours worked. (Hall Dep. at 150.) McCombs testified that the DARs would be an accurate reflection of his approved hours worked. (McCombs Dep. at 151-52.)

When McCombs started working for Guardsmark, he was provided with a copy of the

---

[13] ECF No. 106 Ex. C.
[14] ECF No. 106 Ex. D.

GMTTY and GOR&I. (McCombs Dep. at 66.) He understood that he was supposed to follow the rules and regulations in each of these books; that it was Guardsmark's policy to compensate employees for all time worked; and that Guardsmark would rely on the WTRs to pay its employees. (McCombs Dep. at 66-67.) When he became a supervisor, it was McCombs's duty to make sure the security officers complied with Guardsmark's policies. (McCombs Dep. at 22.) Part of his job was making sure the officers recorded all of the time they worked and he performed that function. He never told his employees that early reporting time was not authorized. (McCombs Dep. at 115-16.) In order to make sure security officers do not perform work before their shift start time, besides Guardsmark's policies, Guardsmark has an extensive Inspection and Regulatory Department that meets with the security officers throughout the country. (Martin Dep. at 77-78.)[15]

Guardsmark's policy was to pay employees based on the WTRs they submitted. (Hall Dep. Ex. 1 at 12; Turner Dep. at 110-12[16]; ECF No. 102 Exs. K, L.) According to Guardsmark personnel, each individual security officer reported his or her hours worked on a time sheet. (Bohnke Dep. at 33, 36; Martin Dep. at 31, 45, 49, 54, 56, 94, 120.) If a security officer put time on his or her WTR, the officer would be paid for that time, even if their schedule did not show the officer being authorized to work for extra hours. (Turner Dep. at 71.) An officer did not need to obtain preauthorization if he or she had to stay until he or she was properly relieved. (Turner Dep. at 79.) Security officers put down the hours they work so whatever hours they work, that is what they are paid. (Turner Dep. at 82.) Whatever the true hours an employee worked is what the employee was paid. There was to be no work performed outside of when an employee was working. (Turner Dep. at 48.) Guardsmark had no expectation of an employee

---

[15] ECF No. 102 Ex. F.
[16] ECF No. 102 Ex. E.

working before he or she came to work or after he or she was done working.  (Turner Dep. at 148.)

After the individual officers had completed their WTRs, the site supervisor would gather the documents and forward them to the branch office.  (McCombs Dep. at 267; Turner Dep. at 149.)  Each individual site supervisor then recorded a summary of those hours and compared the information to the Operations Outline to confirm that no time was missed and that all appropriate hours were billed.  (Bohnke Dep. at 33; Martin Dep. at 32; Turner Dep. at 102-03.)  The Operations Outlines are completed independently from the WTRs.  (Martin Dep. at 32.) Schedules are not used to compute security officers' time.  (Turner Dep. at 108.)  Hall was not paid based on the schedule because changes occurred to the schedule.  (Hall Dep. at 160.)

Guardsmark notes that, regardless of whether the WTRs or the DARs were used to record their hours, the WTRs reflect more hours than the DARs.  (McCombs Dep. at 193, 202-03, 207-08, 212, 214, 216.)  For example, on a DAR for December 19, 2007, McCombs wrote 11 hours for his true hours worked, yet he was paid 12 hours on his WTR.  (McCombs Dep. at 193-94.) Hall submitted and received 88.5 hours of overtime from August 2008 until the end of the year. She submitted and received 72.5 hours of overtime from the beginning of the year until July 2009 when she quit her employment with Guardsmark.  (Hall Dep. Ex. 8.)  McCombs submitted and received 86 hours of overtime from October 22, 2007 until the end of the year, 333.5 hours in 2008, and 72.5 hours of overtime form the beginning of 2009 until he was terminated in July 2009.  (McCombs Dep. Ex. 8.)  McCombs was never denied any overtime he submitted. (McCombs Dep. at 270.)  He admitted that he received significant amounts of overtime. (McCombs Dep. at 74.)

As Hall's direct supervisor, McCombs reviewed and submitted Hall's overtime records.

(McCombs Dep. at 45-46.)  Guardsmark observes that Hall could not say with any specificity that she had ever actually been denied overtime.  (Hall Dep. at 150.)

During her first three days of work, Hall received training from McCombs.  (Hall Dep. at 60-61, 71-74.)[17]  She understood that, to the extent she had any complaints, her direct supervisor, McCombs, was the first person to whom she would address them.  (Hall Dep. at 20.)  McCombs never told her that she needed to arrive 15 minutes early before her shift started.  (Hall Dep. at 24.)

As her supervisor, McCombs had the authority to discipline Hall and set her schedule. (Hall Dep. at 102.)  On November 26, 2008, McCombs disciplined her for fraternizing and remaining two hours on-site after her shift.  (Hall Dep. at 102-03; McCombs Dep. at 43 & Ex. 3.) Hall understood it was McCombs's responsibility to make sure that she was compliant with all of Guardsmark's policies.  (Hall Dep. at 103; McCombs Dep. at 115.)  McCombs never said anything to Hall about how to complete the DARs.  (Hall Dep. at 114.)  On two occasions, Hall said something to McCombs about not being compensated for overtime and she received it; on two other occasions she said something and was not compensated.  (Hall Dep. at 120.) McCombs complained a few times about his pay and it was corrected in the following pay. (McCombs Dep. at 130.)  Hall was aware that if she had a complaint about her pay she could raise it with her supervisor and in the few instances when she did raise those issues the situation was corrected.  (Hall Dep. at 121.)  McCombs made every effort to resolve any difficulties she brought to his attention.  (Hall Dep. at 125.)  Hall never raised any issues with Katie Bohnke about her pay, although she has alleged that Bohnke told her to arrive 15 minutes prior to her shift and not put the time down on any time record.  (Hall Dep. at 127.)

---

[17] Defendant contends that no one other than McCombs provided any training, but Hall's deposition testimony does not say this.

McCombs, who job as a supervisor included disciplining employees when they did not show up for work or came in late, never disciplined anyone for not arriving 15 minutes before a shift started. (McCombs Dep. at 33, 36 & Ex. 3.)[18] When he disciplined Jonathon Cabezas on January 5, 2009 for showing up to work late, McCombs wrote that Cabezas reported to work one hour late, and arrived on site at approximately 9:00 a.m. (McCombs Dep. Ex. 3.) McCombs disciplined Tom Bova on November 6, 2008 for leaving early and causing another employee to have to work overtime. (McCombs Dep. at 49-50.)

The corporate office, through Bohnke, told McCombs never to destroy legal documents, to be accurate in all report writing and to be accurate with respect to timekeeping records. (McCombs Dep. at 40-41.)

As the supervisor, McCombs prepared and posted the schedule. (McCombs Dep. at 52-53.) Hall reported directly to McCombs, yet McCombs never told her she had to arrive 15 minutes early. (Hall Dep. at 24.) McCombs was responsible for training employees and in fact provided Hall her training the first three days with Guardsmark. (Hall Dep. at 60-61, 73-74; McCombs Dep. at 109-10.) McCombs was responsible for making sure that employees complied with all of Guardsmark's policies and understood it was Guardsmark's policy to compensate employees for all time worked. (McCombs Dep. at 35-37, 66-67, 115-16.) McCombs never told any employees to arrive 15 minutes early. (McCombs Dep. at 108, 115-16; Hall Dep. at 24.) McCombs stated that he never had any discussions with his former supervisors about reporting 15 minutes early and Bohnke did not become his direct supervisor until he because a supervisor in August 2008. (McCombs Dep. at 107.) Thus, neither of his former supervisors, Andrew Pounds or Donna McKelvey, told him to arrive at work 15 minutes but that

---

[18] Plaintiffs' response to this statement is "Denied as stated. *See* ¶ 87, above." (ECF No. 105 ¶ 88.) Paragraph 87, however, says "Admitted." (ECF No. 105 ¶ 87.)

he would not be paid for such time. (McCombs Dep. at 106-08.) Bohnke was the manager of Guardsmark's Pittsburgh branch from 2001 to April 2009. (Bohnke Dep. at 8.)[19]

Guardsmark notes that Hall, who had alleged that she was being harassed by another security guard named Tom Bova, stated that she would stay in her car until the start of her shift when she was working with him. She was not disciplined for arriving just before her shift would start. (Hall Dep. at 85-86.) It also notes that no employees raised any complaints to put anyone on notice that any violations were occurring. (Martin Dep. at 76, 78; Hall Dep. at 19-20.)

Guardsmark notes that Plaintiffs admit that, on many days, there was no pass-on information to give, so those days the pass-ons would not have taken any time. (Hall Dep. at 25; McCombs Dep. at 69-70.) In addition, there were times when a security officer was just continuing his or her shift so no pass-on instructions would be given, and there were times when a security officer was not relieved by anyone so no pass-on instructions would be given. (McCombs Dep. at 188-89.) According to Hall, the pre-shift work she had to perform was to sign in; get the radios ready; get her hat, glasses and jacket; get her pass-ons; look at any emails that she might have received; make sure the key was where it was supposed to be. (Hall Dep. at 14.) The amount of time it took to sign in varied. (Hall Dep. at 22.) Hall did not wear the safety glasses when she was sitting in the guardhouse, but only when she was touring the facility and it did not take her very long to put the glasses on. (Hall Dep. at 26.) In addition, the glasses were only worn when security officers were in the plant and when they did their key tours, but the day shift did not perform key tours. (Hall Dep. at 26, 65.)

Part of the pre-shift work consisted of getting the keys from the previous security officer and the process of being handed a set of keys did not take very long. (Hall Dep. at 29.) As

---

[19] ECF No. 102 Ex. D.

noted, there was no need to perform this task on the day shift, only on the afternoon or midnight shifts. (Hall Dep. at 65-66.) Before Hall went on her break, she would put on her safety glasses, jacket and hardhat. (Hall Dep. at 67.) Hall never had any meetings with McCombs or Bohnke before her shift started. (Hall Dep. at 100.)

It was not a security officer's responsibility to prepare logs or event reports. (McCombs Dep. at 100.)[20] Guardsmark contends that the only paperwork a security officer was required to prepare was the DAR, occasionally an unusual incident report, an incident report if a spill occurred at the site, and a sprinkler report. (McCombs Dep. at 101-02.) Plaintiffs respond that they also had to prepare the WTRs. (Bohnke Dep. at 33-36.)

According to Guardsmark, the only equipment the officers had to check was a radio. (McCombs Dep. at 103.) Plaintiffs note that there was also testimony that they had to check the computer, hard hats, glasses, jackets and occasionally a patrol vehicle. (McCombs Dep. at 25, 163; Bohnke Dep. at 20.) The security officers had no responsibility for collecting schedules; McCombs did so only when he became a supervisor. (McCombs Dep. at 103-04.)

Guardsmark's policy was that a security officer was not supposed to stay after a shift was over if the officer had been properly relieved. (McCombs Dep. at 43, 60, 71.) When McCombs was a supervisor, he informed his subordinate employees that they were not permitted to stay after their shifts. Indeed he disciplined Hall for staying after her shift ended. (McCombs Dep. at 60.)

Hall never worked on any reports at home. She never did any work at home other than washing her uniform. (Hall Dep. at 101-02.) She claims that she should be paid for staying after

---

[20] Plaintiffs deny this statement, citing McCombs's testimony about "unusual incident reports." (McCombs Dep. at 101, 270-71.) However, based on his testimony that he did not know what an event report was (McCombs Dep. at 100), it would appear that it was not the same thing as an unusual incident report.

her shift and writing a complaint about David Freed.  Guardsmark notes that this occurred only

once.  (Hall Dep. at 202.)  Bohnke never encouraged Hall to stay at work past her scheduled shift

end time.  (Bohnke Dep. at 89.)

Hall washed her pants, shirts and jacket at home and all of her shirts were washable.

(Hall Dep. at 132, 134-36, 138.)  She was requesting to be paid for two to three hours a week for

doing her laundry.  (Hall Dep. at 138.)

McCombs stated that his shirts and sports jacket were washable, but he took his shirts and

pants to the dry cleaner to be dry cleaned twice a week.  He submitted no receipts for this dry

cleaning. (McCombs Dep. at 224, 229, 232-33.)

Procedural History

Plaintiff Hall filed this action on February 16, 2011 (ECF No. 1) and on May 26, 2011,

she and Plaintiff McCombs filed a First Amended Complaint (ECF No. 17).  On May 11, 2012,

Plaintiffs filed a motion for an order authorizing notice to similarly situated persons pursuant to

29 U.S.C. § 216(b) (ECF No. 49).  After full briefing and a hearing, that motion was denied by a

Memorandum and Order filed on August 17, 2013 (ECF No. 72).  On May 31, 2013, Defendant

filed a motion for summary judgment (ECF No. 99).  Plaintiffs filed their brief in opposition on

June 29, 2013 (ECF No. 106) and Defendant filed a reply brief on July 19, 2013 (ECF No. 107).

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide

that: "The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts

sufficient to establish the existence of any element essential to that party's case, and for which

that party will bear the burden of proof at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322

(1986).  The moving party bears the initial burden of identifying evidence which demonstrates

the absence of a genuine issue of material fact.  Once that burden has been met, the non moving

party must set forth "specific facts showing that there is a genuine issue for trial" or the factual

record will be taken as presented by the moving party and judgment will be entered as a matter

of law.  <u>Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  An

issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the

non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's

favor.  <u>Hugh v. Butler County Family YMCA</u>, 418 F.3d 265, 266 (3d Cir. 2005); <u>Doe v. County

of Centre, Pa.</u>, 242 F.3d 437, 446 (3d Cir. 2001).

"At summary judgment, a plaintiff cannot rely on unsupported allegations, but must go

beyond pleadings and provide some evidence that would show that there exists a genuine issue

for trial."  <u>Jones v. United Parcel Serv.</u>, 214 F.3d 402, 407 (3d Cir. 2000) (citation omitted).

Defendant has submitted a Concise Statement of Material Fact with 186 paragraphs of facts

which are supported by citations to the record.  In response, Plaintiffs have submitted a

Statement of Genuine Issues, in which the following responses are insufficient: a) "denied" (ECF

No. 105 ¶¶ 8, 34, 62, 88); b) "Plaintiffs deny this allegation as incomplete, incoherent or

reasonably capable of more than one interpretation" (ECF No. 105 ¶¶ 27, 44, 46-47, 70, 92, 106,

127, 135-38, 140, 142-50, 152-53, 161-62, 166, 176); c) "Plaintiffs lack sufficient information to

form a belief as to the truth or falsehood of this allegation: (ECF No. 105 ¶¶ 111, 113).  Pursuant

to Local Rule 56(E), all of these statements should be deemed admitted.

Defendant argues that: 1) this case was filed in February 2011 but McCombs's claims accrued in August 2008 so unless he can show willfulness – which he cannot – his claims are untimely; 2) both Plaintiffs' claims must be dismissed because Guardsmark had no actual or constructive knowledge that they were performing work and not being paid for it; 3) Plaintiffs' alleged pre-shift activities are non-compensable because they were "preliminary" to principal activities and the time they allegedly spent was de minimis; 4) there is no evidence that they engaged in post-shift work; and 5) washing uniforms, when not required to be done on the premises, is not a compensable activity.

Plaintiffs respond that there is sufficient evidence in the record to support their claim that Defendant knew that they were performing more than de minimis pre- and post-shift work without compensation, that Guardsmark had a business reason to limit their overtime, that it prohibited them from submitting anything other than "approved" hours for payment, and that it knew they performed more than de minimis "off-the-clock" uniform maintenance work without pay. With respect to the uniform claim, Plaintiffs also contend that when uniform maintenance is required by the employer it is compensable, that this task was not "unexpected" and that Defendant erroneously cites to a Department of Labor Field Operations Handbook section about uniform costs, not laundering (and even if the section applied, there is evidence in the record that they had to iron their uniforms, so the exception would not apply).

In a reply brief, Defendant argues that: 1) Plaintiffs rely on the February 17, 2009 memorandum allegedly prepared by Bohnke to support their contention that Defendant had a business reason to limit overtime hours and began to actively track overtime, but McCombs testified that this memo did not change overtime practices, even if it instituted a change this would not be relevant for McCombs since he is only claiming overtime from October 22, 2007 to

July 29, 2008, and there is no evidence that Hall's overtime hours decreased after this memo was issued; 2) Plaintiffs repeatedly refer to their Amended Complaint, but at the summary judgment stage they must present more than allegations and their declarations (which were previously submitted in support of their motion for collective action notice) contradict their earlier deposition testimony without explanation and thus must be disregarded as sham affidavits; 3) Plaintiffs make no response to Defendant's willfulness argument and thus McCombs's claims must be dismissed as untimely; 4) Bohnke denies Plaintiffs' allegations and when Plaintiffs' counsel sent Bohnke a proposed declaration in which she would have admitted to the practices they allege, she refused to sign it and thus Plaintiffs have no evidence other than their allegations (which are insufficient at this stage of the proceedings) and their declarations (which conflict with their deposition testimony); and 5) not only do Plaintiffs have no evidence that they were required to perform post-shift work, but McCombs testified he told subordinate employees they were not permitted to stay after their shift and disciplined Hall on an occasion when she did.

FLSA Actions

The FLSA states that employers who require their employees to work more than forty hours per week must pay them for that excess time at a rate not less than one and one-half times the regular rate at which they are employed. 29 U.S.C. § 207(a)(1). An employee who is not paid for this excess time may bring suit under the FLSA. 29 U.S.C. § 216(b). The FLSA requires that actions be filed within two years of a violation, or three years if plaintiffs allege a willful violation of the statute. 29 U.S.C. § 255(a).

Pre-Shift Work

Plaintiffs' primary claim is that Katie Bohnke, branch manager of the Pittsburgh office from 2001 until April 2009 (Bohnke Dep. at 8), told them to arrive at their posts 15 minutes early

and not put the time down on any records. (Hall Dep. at 15, 17, 20, 23-24, 31, 253-54; McCombs Dep. at 53-54, 61-62, 117.)[21] They contend that they were required to perform pre-shift work including receiving pass down instructions, checking equipment, meeting with supervisors, guarding, monitoring, patrolling, inspecting and surveilling. (Hall Decl. ¶¶ 11-15; McCombs Decl. ¶¶ 11-15.) They have submitted a memorandum written by Bohnke[22] on February 17, 2009 on the subject of "overtime" which states as follows:

> As you are probably aware, there is consistent pressure to reduce overtime. You likely hear about this constantly from me personally, from Brenda Arms, Bill Hrach, or your site supervisor. I apologize for seeming like a tyrant regarding overtime. As I have said to many of you, I would not make it an issue unless it was being made an issue to me from above.
>
> In the past, this branch has done very well to control overtime costs with so many part-time employees. However, in the past the expectations for controlling overtime were also minimal at fewer than 5% total hours billed for the branch, or no more than 150 hours in a week. This was easily achieved. Then the expectation lowered to fewer than 3% total hours billed, or no more than 100 hours in a week for the branch. But as of 6 months ago when things got pretty bad in the economy, the company expectation became less than **0.99%** total hours billed, or not more than **<u>29 hours</u>** total in a week for the entire branch.
>
> When the expectation lowered to 0.99%, the branch has failed to meet the expectation nearly every single week. Why is this? Part of this reason is that while there may be fewer part-time employees working now than previously, many of these part-time employees refuse to work when they are called. This could be for various reasons, such as having another job, attending school, family commitments, transportation issues, and the like. However, often times we hear these people flat-out refuse to work "just because." Is it just because they would rather stay home to play Wii? Is it just because they don't like their manager and want to make things difficult for this person? Is it just because they don't want to drive an extra 10 minutes to a new job site? Is it just because they want to claim

---

[21] ECF Nos. 106 Exs. H, I.

[22] Defendant contends that the memo is not "admissible evidence" because Bohnke did not recall writing it and stated that she doubted it was valid because she had not initialed or signed it. (Bohnke Dep. at 111, 116) (ECF No. 108 Ex. C.) However, the standard for purposes of summary judgment is whether "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed.R.Civ.P. 56(c)(2). In this case, the authenticity of the document may be disputed but Defendant has not argued that the memo could not be presented in a form that would be admissible in evidence.

partial unemployment instead of actually working?  If any of these reasons apply to you, I kindly ask you [to] turn in your uniform and any equipment, such as keys to your site, and leave our company now.

If you work at a site that has had overtime and know how much, even a small amount, multipl[y] that problem by 14.  That is how many accounts we have.  If every site has one call-off, there is a potential for 8 hours of overtime, or possibly just 112 hours without any other situation anywhere else.  We rely on the part-time people to step up when called upon.  There are several sites and … everyone to work around eliminating overtime at every possibility.  So if part-timers are limited as what/when s/he can help, then I want the supervisor to work within those limitations.  Everyone needs to be flexible and possibl[y] rotate a shift or else stay over and make up tie on the back end of another shift later in the week perhaps.  Be creative with schedules, and work with your manager to accommodate and see about others that may be cross-trained to that location.  Managers have much experience too in making schedules jive for this purpose.

Additionally, because there has been too much overtime lately, there must be better controls in place.  **Therefore, if there is ANY overtime at all at your site, it must be approved by your account manager first.**  This includes how any call-offs, request-offs, or vacations will be handled or approved in the coming months.  It is understandable that illness will occur and people get sick occasionally, but as a previous memo regarding time off indicated, requested time off and vacation time is not guaranteed.  <u>If due to a vacancy at the site, ANY request may be denied.</u>  **Therefore, no supervisor is permitted to grant requested time off or vacation time on a schedule unless that has been approved by the account manager ahead of time until this directive changes.**

Everyone's efforts are needed to make this branch work well and succeed.  Overtime is being highly scrutinized by upper executive management within Guardsmark.  It will continue to remain my focus at all accounts and ensure that we are on a path to achieve our goals.  Thank you in advance for all your cooperation and assistance!

(ECF No. 106 Ex. E.)[23]  The memo was distributed to Guardsmark security officers, ten of whom acknowledged it by signature, including Hall and McCombs.

Defendant challenges Plaintiffs' claim regarding Bohnke with a number of arguments.

Defendant contends that: 1) Bohnke not only no longer works for Guardsmark, but actually sued

---

[23] The ellipsis refers to the last line of the first page of the memo, which has been cut off.

Guardsmark;[24] 2) Plaintiffs' counsel sent Bohnke a proposed declaration in which she would have admitted directing Hall and McCombs to report 15 minutes early and not put the time on their timesheets, but she refused to sign it (ECF No. 102 Ex. J); 3) at her deposition, Bohnke denied ever having told them to report early (Bohnke Dep. at 17, 21-22, 77) and Bohnke stated that she did not talk to anyone from Guardsmark or its counsel's office in order to prepare for her deposition (Bohnke Dep. at 121-22); 4) no one else ever discussed this issue with them (Hall Dep. at 24, 33, 163); 5) Hall and McCombs have no evidence that they arrived at work 15 minutes early every day and they did not keep any notes of the hours they worked (McCombs Dep. at 86, 147-49); and 6) there is no indication that Hall's overtime hours decreased after the memo was issued (Hall Dep. Ex. 8). These arguments address the credibility of witnesses, the weight to be given to certain pieces of evidence and inferences that could be drawn in Defendant's favor, but must be drawn in Plaintiffs' favor at this stage of the proceedings. All of these arguments are inappropriate in the context of a motion for summary judgment and are rejected.

Defendant cites a series of cases in which courts of appeals have held that an employee who is responsible for accurately maintaining and submitting his or her own timesheets and fails to report all of the overtime worked is generally precluded from bringing an FLSA claim for the unreported overtime. ECF No. 100 at 17-20 (citing Forrester v. Roth's I.G.A. Foodliner, Inc., 646 F.2d 413, 414 (9th Cir. 1981); Wood v. Mid-America Mgmt. Corp., 192 F. App'x 378 (6th Cir. 2006); Newton v. City of Henderson, 47 F.3d 746, 749 (5th Cir. 1995)). However, Defendant has not addressed another feature common to these cases that distinguishes them from

_____

[24] Bohnke filed a lawsuit against Guardsmark (Bohnke Dep. at 6-7) on March 8, 2011 (Civ. A. No. 11-305), alleging various civil rights claims. The case was dismissed by Judge Conti on May 9, 2013 after the parties reached a settlement in a mediation with Chief Magistrate Judge Lenihan on April 12, 2013.

the instant case.  Judge McLaughlin recently addressed this very issue:

> Unlike in each of the cases cited above, however, Plaintiffs have presented evidence in the instant case to suggest that Defendants attempted to discourage or squelch accurate overtime reporting. For instance, Stanislaw testified that his direct supervisor, Dan Wyzkiewicz, would occasionally complain that Stanislaw was "doing him on overtime," and that Stanislaw and Wyzkiewicz had engaged in several "heated discussions" about Stanislaw's attempts to submit all of the overtime hours that he had worked.  Stanislaw testified that, on one occasion, Wyzkiewicz indicated that he wouldn't pay Stanislaw for overtime that he had worked and told him to "quit claiming overtime." Stanislaw testified that "if I worked 10 hours of overtime, they give me one or two hours" and that "you had to beg to get paid." Stanislaw described one instance where his supervisor, Wyzkiewicz, overrode his time card and allegedly changed it to eliminate two hours of overtime that Stanislaw had worked on a holiday.  He also testified that Wyzkiewicz, on multiple occasions, had instructed Stanislaw to record and report his time as a 7.5 hour day beginning at 8:00 A.M., irrespective of the actual hours worked.  When Stanislaw complained about not being able to report his overtime, he was told by Wyzkiewicz and fellow supervisors Douglas Knight and Jim Dawson that "there [are] other jobs out there."

Stanislaw v. Erie Indemnity Co., 2012 WL 517332, at *6 (W.D. Pa. Feb. 15, 2012) (citations omitted).  Similarly, plaintiff Charles Kirkpatrick testified that his office manager stated that "they didn't expect overtime to be an issue, they didn't expect overtime to be submitted." Another plaintiff reported various incidents in which his supervisors would refuse his requests for overtime, and a third stated that a supervisor told him to carry overtime hours over to days when he worked less than 7.5 hours rather than submit the actual hours worked.  Id. at *7.  The court noted that "[c]ourts have consistently held that a company 'cannot disclaim knowledge' of untruthful overtime reports 'when certain segments of its management squelched truthful responses.'"  Id. (citing Brennan v. General Motors Acceptance Corp., 482 F.2d 825, 828 (5th Cir. 1973)).  See also Allen v. Board of Public Ed. for Bibb County, 495 F.3d 1306 (11th Cir. 2007); Monroe v. FTS USA, 763 F. Supp. 2d 979, 993 (W.D. Tenn. 2011).  The court also observed that the courts in Wood, Newton and Forrester themselves explicitly recognized that the results might be different if there had been evidence that an employer had actively

discouraged accurate time reporting. Id. at *9. Finally, the court noted that the defendant had supplied deposition testimony from its managers and supervisors denying that they instructed the plaintiffs not to report all of their overtime and denying that they modified or altered time record to eliminate overtime. The court conclude that: "Resolution of this matter is appropriately left in the hands of a jury." Id. at *10.

For the same reason, Defendant's attempt to discredit Plaintiffs' claim about what Bohnke told them to do cannot be accepted in the context of a motion for summary judgment. Thus, the arguments regarding the claims for pre-shift work for which Plaintiffs were not compensated are rejected and, with respect to these claims, the motion for summary judgment is denied.

Willfulness

To show willfulness under the FLSA, a plaintiff must prove that "the employer either knew or showed reckless disregard for the matter of whether its conducted was prohibited by the statute…." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). The Supreme Court indicated that "'willful' is considered synonymous with such words as 'voluntary,' 'deliberate,' and 'intentional.'" Id. at 133. The burden of showing willfulness falls upon the plaintiff. Id. at 135.

Defendant argues that McCombs's claims, which accrued in August 2008, are time barred because he has not pointed to evidence of willfulness and therefore he had only two years to file suit, yet this lawsuit was not filed until February 2011. Plaintiffs have not specifically replied to this argument, although they contend generally that the February 17, 2009 memo, "along with the numerous record facts describing the extent of Defendant's wage denial practices, see Plaintiffs' Statement of Genuine Issues (filed herewith) more than supplies the

element of willfulness that Defendant claims is missing from this case." (ECF No. 106 at 2-3.)

Although Plaintiffs have pointed to evidence from which the trier of fact could conclude that they were told by Katie Bohnke to report to their posts 15 minutes early but not to put the information on their time records, McCombs stated that neither Andrew Pounds nor Donna McKelvey, his supervisors when he was a security guard from October 22, 2007 through July 2008, ever told him to engage in this practice. (McCombs Dep. at 106-08.) Thus, there is no evidence of willfulness. In addition, it is noted that, because McCombs is not seeking overtime for the period when he was a site supervisor (and Bohnke was his supervisor), McCombs has effectively conceded that he has no evidence that he performed pre-shift work without pay at any time. Therefore, with respect to McCombs's claim of pre-shift work, the motion for summary judgment will be granted.

Post-Shift Work

Defendant argues that Plaintiffs have no evidence that they engaged in post-shift work and, in fact, McCombs, as Hall's supervisor, not only told her that she was not supposed to work after her shift was completed but even disciplined her on one occasion for staying after her shift. (McCombs Dep. at 43, 60, 71 & n.3.) Hall admitted that she was disciplined by McCombs for staying two hours after her shift had ended. (Hall Dep. at 102-03.) Defendant also notes that Plaintiffs do not even contend that Bohnke told them to remain after their shifts and perform post-shift work but not document the time.

Plaintiffs' only support for their claim of post-shift work is the Amended Complaint and the statements in their declarations. However, as explained above, at the summary judgment stage, a plaintiff must proceed beyond the allegations of a complaint and point to evidence in the record to support a claim. Moreover, although declarations may be used for this purpose, the

24

statements in Plaintiffs' declarations that they had to perform post-shift work contradict their deposition testimony on this subject without explanation.

> Under the sham affidavit doctrine a court will disregard an affidavit inconsistent with an affiant's prior deposition testimony when a party moves for summary judgment on the basis of the deposition unless the party relying on the affidavit in opposition to the motion can present a legitimate reason for the discrepancies between the deposition and the affidavit.

Smith, 593 F.3d at 285 n.3.  Because Plaintiffs have failed to point to any evidence to support their claims of post-shift work, Defendant's motion for summary judgment with respect to these claims will be granted.

Washing Uniforms

Plaintiffs contend that they were required to wear uniforms, that they had to wash these uniforms and that they were not compensated for the time spent on this task.  Defendant argues that such time is not compensable under the FLSA.

Defendant cites the Department of Labor (DOL) Field Operations Handbook, which specifically provides that "the time spent in washing uniforms will not be considered hours worked for either [minimum wage] or [overtime] pay purposes."  Department of Labor, Wage and Hour Division, Field Operations Handbook (FOH) § 30c12(b)(5).  In addition, it notes that the FLSA distinguishes between "principal" activities and "preliminary" or "postliminary" activities, the latter of which "occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities."  29 U.S.C. § 254(a)(2).  Department of Labor regulations provide that preliminary and postliminary activities include "changing clothes, washing up or showering, and waiting in line to receive pay checks."  29 C.F.R. § 790.7(g).  A number of courts have held that "unless the law, the employer, or the nature of the work requires

that a preliminary or postliminary activity be performed on the employer's premises, the time spent on such activity is not compensable." DeKeyser v. Thyssenkrupp Waupaca, Inc., 747 F. Supp. 2d 1043, 1053 (E.D. Wis. 2010); Bamonte v. City of Mesa, 598 F.3d 1217 (9th Cir. 2010) (because police officers were not required to don and doff their uniforms and gear at the workplace, the time spent doing so was not compensable).

Plaintiffs have not argued that Guardsmark required them to wash their uniforms at work and in fact both Hall and McCombs state that they were prohibited from maintaining their uniform components "on the clock" or at their worksites. (Hall Decl. ¶ 28; McCombs Decl. ¶ 28.)

Plaintiffs respond that: 1) the FLSA's enabling regulations plainly state that any work employer "suffers or permits" to be performed, whether at the job site or away from the job site, must be counted as hours worked when the employer "knows or has reason to believe" the work is being performed; 2) Portal-to-Portal preemption cannot apply to the uniform maintenance work at issue here because it does not serve either of the Act's goals (affirming employers' obligation to pay for all work their employees perform during the workday and freeing them from paying for "unexpected" activities unrelated to their work); and 3) Defendant cites a section of the FOH that relates to reimbursement for uniform costs, not maintenance, and even if it applied, there is evidence in the record that the uniforms required ironing, thus falling outside the exemption.

DOL regulations state that: "Work not requested but suffered or permitted is work time." 29 C.F.R. § 785.11. "The rule is also applicable to work performed away from the premises or the job site, or even at home. If the employer knows or has reason to believe that the work is being performed, he must count the time as hours worked." 29 C.F.R. § 785.12. Finally:

In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.

29 C.F.R. § 785.13.

On the other hand, the Portal-to-Portal Act of 1947 states that employers are relieved from liability and punishment for failure to pay overtime under the following circumstances:

(a) Activities not compensable
Except as provided in subsection (b) of this section, no employer shall be subject to any liability or punishment under [the FLSA] ... on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee ...

(2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities....

29 U.S.C. § 254. The Supreme Court has defined non-compensable "preliminary" and "postliminary" activities as set out in § 254(a)(2) as those which are not "an integral and indispensable part of the principal activity of the employment." Steiner v. Mitchell, 350 U.S. 247, 256. The Court has also explained that "the fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity' under Steiner." IBP, Inc. v. Alvarez, 546 U.S. 21, 40-41 (2005). The Court of Appeals has noted that, "generally, preliminary and postliminary activities remain compensable so long as those activities are an integral and indispensable part of the principal activities." De Ascencio v. Tyson Foods, Inc., 500 F.3d 361, 372 (3d Cir. 2007).

Courts have noted, however, that these two terms are "not synonymous." In Schwartz v. Victory Security Agency, L.P., 2011 WL 2437009 (W.D. Pa. June 14, 2011), Judge Schwab was presented with the question of whether "uniform maintenance work" is an integral and indispensable duty under the FLSA. The court cited the following passage from Musticchi v. City of Little Rock, Arkansas, 734 F. Supp. 2d 621, 630-32 (E.D. Ark. 2010):

> The Second Circuit has recognized that "indispensable is not synonymous with integral. Indispensable means necessary.... Integral means, inter alia, essential to completeness; organically joined or linked composed of constitutes parts making a whole." Gorman v. Consolidated Edison Corp., 488 F.3d 586, 592 (2d Cir. 2007) (internal quotations and citations omitted). The court added that "[s]harpening the knife is integral to carving a carcass, Mitchell v. King Packing Co., 350 U.S. 260, 263, 76 S.Ct. 337, 100 L.Ed. 282 (1956); powering up and testing an x-ray machine is integral to taking x-rays, Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 707 (2d Cir. 2001); and feeding, training and walking the dog is integral to the work of a K-9 officer, Reich v. N.Y. City Transit Auth., 45 F.3d 646 (2d Cir. 1995)." Id. Relying on Gorman, the Ninth Circuit in Bamonte stated that if "an activity is indispensable [it] does not necessarily mean that the activity is integral to the work performed." Bamonte [v. City of Mesa], 598 F.3d [1217,] 1232 [(9th Cir. 2010)]. Thus, if an activity is not essential to complete the employee's principal task the employee is not entitled to compensation for the activity pursuant to the Portal-to-Portal Act.

Id. at *4. The court concluded that, as in Musticchi, "while Plaintiffs may have been required to wear and therefore maintain their uniforms, such actions were not integral and indispensable to Plaintiffs' principal activity, providing security." Id. at *5. The same analysis applies here. That is, cleaning of uniforms was not integral or indispensable to Plaintiffs' principal activity, namely providing security.

Plaintiffs are also incorrect about the FOH section, which is titled "Cost of furnishing and maintaining uniforms." FOH § 30c12 (emphasis added). In addition, Defendant has cited from § 30c12(b), which is titled "Cost of and time spent in maintaining uniforms." Thus, it is not solely limited to the cost of furnishing uniforms. The section specifically provides that:

Where employee uniforms require ironing, drycleaning, daily washing,

commercial laundering, or other special treatment, because of heavy soiling in work usage or in order to meet cleanliness or appearance standards set by law, by an employer, or by the nature of the work, the employees must, absent documentation of the greater or lesser cost, be reimbursed for uniform maintenance costs which reduce their wages below the [minimum wage] in accordance with the amounts set forth in (b)(3) below.

However, in those instances where uniforms are (a) made of "wash and wear" materials, (b) may be routinely washed and dried with other personal garments, and (c) do not require ironing or other special treatment such as drycleaning, daily washing, or commercial laundering, [the Wage and Hour Division] will not require that employees be reimbursed for uniform maintenance costs. This position is not applicable where daily washing is required and the employer furnishes or reimburses the employee for a single uniform.

FOH § 30c12(b)(1-2). See also 29 C.F.R. § 4.168(b)(1)(employer must reimburse employees if they are required to wear uniforms, but), § 4.168(b)(2)(no reimbursement if uniforms are "wash and wear" which may be routinely washed and dried with other personal garments and do not generally require daily washing, dry cleaning, commercial laundering or other special treatment).

Hall testified that she washed her uniform (Hall Dep. at 132-34), that all her shirts were washable (Hall Dep. at 138) and McCombs stated that he had long and short sleeved shirts and pants, that he washed the short sleeved shirts and that he had the long sleeved shirts and the pants dry cleaned twice a week. (McCombs Dep. at 224-25, 229.) However, he did not indicate that he was required to dry clean his uniform or launder it with a particular frequency. Thus, under the FOH section, reimbursement was not required.

Plaintiffs argue in a footnote that the FOH is not entitled to deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). (ECF No. 106 at 10 n.3) (citing Abel v. Southern Shuttle Servs., Inc., 301 F. App'x 856, 859 (11th Cir. 2008). The case actually goes on to state that the FOH may nevertheless "be persuasive." Id. In any event, Plaintiffs have not explained how they reach the opposite result. Therefore, with respect to Plaintiffs' claims related to uniform maintenance, Defendant's motion for summary judgment

will be granted.

For these reasons, the motion for summary judgment filed by Defendant will be granted with respect to Plaintiffs' claims of post-shift work, the claims regarding maintenance of uniforms and Plaintiff McCombs's claim of pre-shift work and denied with respect to Plaintiff Hall's claim of pre-shift work.  An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PATRICIA HALL and WALTER MCCOMBS,   )
                        Plaintiffs,   )
                              )
     vs                           )       Civil Action No. 11-213
                              )       Magistrate Judge Mitchell
GUARDSMARK, LLC,                 )
                   Defendant.   )

## ORDER

AND NOW, this 11th day of September, 2013, for the reasons discussed above,

IT IS HEREBY ORDERED that the motion for summary judgment filed by Defendant, Guardsmark, LLC (ECF No. 99), is granted with respect to Plaintiffs' claims of post-shift work, the claims regarding maintenance of uniforms and Plaintiff McCombs's claim of pre-shift work and denied with respect to Plaintiff Hall's claim of pre-shift work.

s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge